UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| THE OLIVER STORES, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) | No. 2:11-cv-353-NT |
|  | ) |  |
| JCB, INC., | ) |  |
|  | ) |  |
| Defendant | ) |  |

## RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS OR STAY AND COMPEL ARBITRATION

In this dealer termination suit removed from the Maine Superior Court (Cumberland County), the defendant, JCB, Inc., moves to dismiss or, in the alternative, to stay the action and to compel arbitration, pursuant to a written agreement between the parties. I recommend that the court grant the motion to stay and to compel arbitration, with some specific limitations. Because the defendant makes no argument in support of dismissal that differs in any way from its argument in support of its request that the court compel arbitration, I need not reach the question of dismissal.

### I. Factual Background

The complaint alleges, in relevant part, that the plaintiff became a dealer of machinery and equipment of the defendant in 1999. Complaint (Docket No. 2-1) ¶ 9 & Exh. A. The defendant promised that it intended to secure a 10% share of the market for these products. *Id*. ¶ 10. The plaintiff never attained this market share, and the defendant ignored advice from its dealers that its prices were too high and its parts and service support "were known as dismal."

1

*Id*. ¶ 11. Over the years when the plaintiff was a dealer for the defendant, the defendant went through five different presidents and 5 different regional sales representatives. *Id*. ¶ 15.

In 2009, under new management, the defendant initiated talks about a new franchise agreement. *Id*. ¶ 16. The defendant offered to give the plaintiff loadalls and rough terrain forklifts, two lines for which the plaintiff had not previously been a dealer. *Id*. ¶ 17. The plaintiff made clear that it would take the lines only if it were the only dealer for them in the region. *Id*.

In late summer 2009, the parties entered into a franchise agreement under which the plaintiff agreed to sell the defendant's construction equipment and the defendant agreed to provide the equipment and support needed to sell its equipment. *Id*. ¶ 19. However, the defendant did not improve its market share or its parts and service support. *Id*. ¶ 23. The defendant also priced its parts above those of its competitors. *Id*. ¶ 27. The plaintiff also learned that it was not the exclusive dealer in the area for the defendant's products. *Id*. ¶ 28.

The defendant decided to deal with dealer and customer complaints about the availability and delivery of parts by starting the "48 hour guaranty program." *Id*. ¶ 30. This program put the burden on the dealer to have enough parts in stock purchased from the defendant so that parts could be supplied promptly. *Id*. In return for a dealer's purchase of a long list of required parts, the defendant promised to ship parts not on the list within certain time periods. *Id*. When the plaintiff asked to return slow-moving parts for credit, the defendant did not respond. *Id*. ¶ 31.

On June 30, 2010, the parties met to discuss a joint five-year plan for increasing sales penetration in the plaintiff's area of primary responsibility. *Id*. ¶ 33. The parties also discussed ongoing issues revolving around the ability and willingness of the defendant to provide adequate service and timely responses. *Id*. ¶ 35. After the meeting, the defendant said that it would take

back all of the plaintiff's parts and would only pay half of their value. *Id*. ¶ 36. This meant that the plaintiff could not afford to participate in the guaranty program. *Id*.

On October 14, 2010, Jim Fielding of the defendant wrote to the plaintiff and informed it that the defendant did not plan to renew the parties' contract. *Id*. ¶ 37. The letter did not provide a period of time in which the plaintiff could cure any claimed deficiencies, and no defaults or cause under the franchise agreement were identified. *Id*. The parties' contract, which had already been renewed for 2011, did not permit such terminations under the circumstances. *Id*. ¶ 38.

The plaintiff responded on October 22, 2010, challenging the basis for the termination. *Id*. ¶ 39. On November 9, 2010, Jim Fielding informed the plaintiff that the defendant had decided not to renew the contract, that there would be no further discussion, and that the only reason for the non-renewal was the defendant's perception of a lack of focus by the plaintiff on the defendant. *Id*. ¶ 40. The defendant refused to meet in person with the plaintiff with respect to this subject. *Id*. ¶ 41.

On November 30, 2010, the plaintiff sent a letter to the defendant stating that the contract had already been renewed pursuant to its own terms. *Id*. ¶ 43. The letter also stated that the plaintiff wished to remain a dealer for the defendant and wanted to meet to work out the parties' differences. *Id.* On December 16, 2010, the defendant sent a letter to the plaintiff stating that the plaintiff had six months "to cure" and that the deadline ran on June 16, 2011. *Id*. ¶ 44. It identified the cause for termination as a failure to use best efforts to promote sales of the defendant's products, to pursue the sale and support of the defendant's products, and to implement its annual business plan. *Id*. ¶ 45.

The defendant had already given the franchise rights to the plaintiff's area to another company, NITCO. *Id*. ¶ 49. On June 21, 2011, the defendant informed the plaintiff that it had terminated the dealership agreement between the parties. *Id*. ¶ 52. It also ended the plaintiff's ability to purchase parts to service machines that it had already sold and ended its ability to perform warranty work. *Id*. ¶ 53. As a result, the plaintiff lost income, profit, and good will. *Id*. ¶¶ 54-55. The defendant was only willing to buy back one of seven new machines that the plaintiff had in stock. *Id*. ¶ 56. To date, the plaintiff has only been able to sell two of the six machines, at a loss of about $75,000. *Id*. ¶ 57.

The defendant has offered to pay little more than half the amount due under the contract for parts still in the plaintiff's possession. *Id*. ¶ 58. The plaintiff has also performed warranty work approved by the defendant for which the defendant has refused to pay. *Id*. ¶ 59.

## II. Applicable Legal Standards

The defendant's motion invokes the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq*. Defendant's Motion to Dismiss or Stay and Compel Arbitration ("Motion") (Docket No. 8) at 3.

> The FAA provides that an arbitration clause in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. When a contract contains an arbitration clause, "doubts should be resolved in favor of coverage." *Municipality of San Juan v. Corporación para el Fomento Económico de la Ciudad Capital*, 415 F.3d 145, 149 (1st Cir. 2005) (citation and internal punctuation omitted). An order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (citation omitted); *see also Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 528 (1st Cir. 1985). This is particularly true where the arbitration clause is "quite broad." *San Juan*, 415 F.3d at 149. An arbitration clause that defines its scope to include "[a]ll claims, disputes and other matters in questions arising out of, or relating to, this Agreement or the breach thereof" is "facially broad in scope." *Winterwood Farm, LLC v. JER, Inc.*, 327 F.Supp.2d 34, 39 (D. Me. 2004). "The existence of a broad agreement to arbitrate creates a

presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *MSAD No. 68 v. Johnson Controls, Inc.*, 222 F.Supp.2d 50, 55 (D. Me. 2002) (citation and internal punctuation omitted).

*Brown Pontiac-Olds, Inc. v. General Motors Corp.*, No. 05-204-P-H, 2006 WL 318827, at *3 (D. Me. Feb. 9, 2006).

> Pursuant to Section 3 of the Federal Arbitration Act, the Court's consideration of a motion to compel arbitration involves the determination of (1) whether there is an agreement to arbitrate, (2) whether the dispute in question falls within the scope of that arbitration agreement, and (3) whether the party seeking arbitration has waived the right to compel arbitration. *See Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008) (quoting *Bangor HydroElectric Co. v. New Eng. Tel. & Tel. Co.*, 62 F.Supp.2d 152, 155-56 (D. Me. 1999)). Questions of arbitrability must be addressed with a "healthy regard" for the federal policy favoring arbitration. *See Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 528 (1st Cir. 1998) (internal citation omitted); *see also V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 770 A.2d 95, 96 (Me. 2001) ("Maine has a broad presumption favoring substantive arbitrability") (internal citation omitted).

*Gove v. Career Sys. Dev. Corp.*, __ F.Supp.2d __, 2011 WL 5433827, at *2 (D. Me. Nov. 9, 2011).

### III. Discussion

The agreement at issue in this case, a copy of which is attached to the complaint, provides as follows with respect to arbitration:

> In the event of any dispute, except for matters relating to collection of accounts due under this Agreement, the parties will attempt in good faith to negotiate a mutually agreeable resolution of such dispute. If such dispute is not amicably resolved, then all such disputes shall be settled by binding arbitration conducted in Atlanta, Georgia. All such arbitration proceedings shall be conducted pursuant to the Rules and Regulations of the American Arbitration Association (hereinafter "AAA Rules and Regulations"), including but not limited to its "Expedited Procedures" and "Optional Rules for Emergency Measures of Protections."
>
> * * *

> The parties hereby authorize and empower the above-appointed arbitrator to hear and determine all disputes between the parties hereto concerning the subject matter of this Agreement.

JCB Dealership Agreement ("Agreement") (Docket No. 2-1) ¶¶ 18.1, 18.4.

This language is sufficiently broad to create a presumption of arbitrability under the legal standards quoted above. Doubts should be resolved in favor of arbitration, and it cannot be said "with positive assurance" that this language is not susceptible of an interpretation that includes the disputes set out in the complaint. The claims asserted in the complaint "arise because [the plaintiff] entered into and attempted to perform the contract with [the defendant]" and thus are subject to the arbitration clause. *See Combined Energies v. CCI, Inc.*, 484 F.Supp.2d 186, 189 (D. Me. 2007).

The plaintiff contends that Maine law nonetheless requires that its claims for violation of the Maine Franchise Law (Count I) and the Maine Unfair Trade Practices Act (Count II) be tried to a jury. Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition") (Docket No. 10) at 6-7. The FAA overrides state law on this point, *see KKW Enter., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 50 (1st Cir. 1999) (state franchise law cannot make unarbitrable that which FAA makes arbitrable), and the Agreement language cannot reasonably be read to waive the defendant's rights under the FAA *sub silentio*.[1] Indeed, if a party to a contract containing the arbitration clause present in this case were able to avoid its imposition merely by dressing its claims against the other contracting party in state statutory language, the arbitration clause would be rendered meaningless surplusage.

---

[1] In addition, I agree with the defendant, Reply Memorandum of Law in Support of Defendant's Motion to Dismiss or Stay and Compel Arbitration ("Reply") (Docket No. 11) at 2, that Maine's Unfair Trade Practices Act, the basis cited for Count II in the Complaint, Complaint ¶¶ 71-74, does not provide the plaintiff, a commercial entity, with a right of action in any event. 5 M.R.S.A. § 213; *C-B Kenworth, Inc. v. General Motors Corp.*, 706 F.Supp. 952, 957 (D. Me. 1988).

6

The plaintiff offers a slightly different argument with respect to the last of the three counts in its complaint, its claim for breach of contract. It asserts that Count III "includes claims for collection of funds owed for parts and machinery," and that "collection disputes are excepted specifically out of the arbitration provision." Opposition at 6. The defendant's response is that this exception is made only to the requirement that the parties make a good faith attempt to negotiate resolution of disputes before proceeding to arbitration. Reply at 3. This is certainly a possible interpretation of paragraph 18.1 of the Agreement, which is quoted above.

Even if the plaintiff's interpretation of the Agreement language is correct, however, its argument does not prevail. Count III is entitled "Breach of Contract" and alleges several different breaches, only one of which could possibly be considered a claim for "collection." Complaint ¶¶ 75-85. There is no sense in which Count III can be considered solely a collection cause of action, or, on its face, even primarily a collection claim. On the showing made, the plaintiff is not entitled to carve Count III out of an arbitration proceeding on its other claims that concern the subject matter of the Agreement.

The plaintiff also argues that the defendant is not entitled to an order compelling arbitration because it has not shown that it has engaged in a good faith attempt to resolve the parties' disputes, which is required by the terms of the Agreement. Opposition at 8. The plaintiff points out that it alleged in the complaint that the defendant "engaged in bad faith" and asserts, without citation to authority, that this allegation "must be taken as true." *Id*. If that were the case, most plaintiffs could successfully avoid arbitration despite having agreed to that route for resolution merely by alleging that the other party had "engaged in bad faith."

The defendant responds that this is an argument to be made to the arbitrator rather than providing a reason to avoid arbitration altogether. Reply at 4-5. This position is correct. *See*

7

*Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 383 (1st Cir. 2011) (very similar arbitration clause); *see also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 85 (2002).

A final argument raised by the plaintiff requires discussion, although the defendant does not respond to it. The plaintiff points out, Opposition at 6, that paragraph 21 of the Agreement provides as follows:

> If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this Agreement is to be performed, or denies access to the procedures, forums or remedies provided for by such laws or regulations, such provisions shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force and effect.

Agreement, ¶ 21. The plaintiff asserts that this paragraph trumps the arbitration clause, because that clause would otherwise deprive it of its rights to bring court actions under the Maine Franchise Law and the Maine Unfair Trade Practices Act. Opposition at 6.

I have already concluded that the plaintiff does not have a right of action under the Maine Unfair Trade Practices Act because the latter does not provide a commercial entity with a right of action. That is not the case with the Maine Franchise Laws for Power Equipment, Machinery and Appliances, which provides at 10 M.R.S.A. § 1362 that "[a] dealer, distributor, or franchisee who has been damaged by violation of this chapter may bring an action to enjoin the violation and to recover damages arising from the violation."

Therefore, as to Count I of the complaint, the Maine Franchise Law claim, the arbitration analysis under the terms of the Agreement yields a different result. The arbitration clause in the Agreement cannot reasonably be read to "contravene" Maine's franchise statutes or to deny the plaintiff access to the remedies provided by those statutes, but the plaintiff's suggestion that it denies the plaintiff access to the procedures or forums provided by those statutes is well taken.

The plaintiff has access to the courts for review of the arbitration decision, 9 U.S.C. § 10, but that provision does not provide the procedures or forum provided by those statutes, as it strictly limits the issues which may be addressed by a court under those circumstances.

Thus, it appears that the Agreement, by its own terms, allows the plaintiff to go forward in court with its state statutory claim in Count I. It also appears preferable, however, to stay consideration of that claim until Counts II and III are resolved, whether by arbitration or by the summary process that the defendant asserts it will invoke, Reply at 2 n.1.

### IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to dismiss be **DENIED** and that its motion to stay and to compel arbitration be **GRANTED,** but that arbitration be compelled only as to Counts II and III of the complaint.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of December, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge